OPINION
{¶ 1} This matter is before the Court on the Notice of Appeal of Extermital Termite Service of Dayton, Inc. ("Extermital"), filed January 23, 2007. On October 29, 2004, Triangle Credit Union ("Triangle") filed a Complaint for Money Damages against Extermital. Triangle *Page 2 
alleged that on September 3, 2004, Extermital issued a check to an employee of Extermital, Reggie Fleming, in the amount of $4, 300.00, which Triangle cashed for Fleming, and which was then returned to Triangle unpaid due to a stop payment order issued by Extermital. Fleming had represented to Extermital that he needed to borrow the money to pay for his sister's funeral, and Extermital issued a promissory note to Fleming along with the check. The amount borrowed was to be deducted from Fleming's upcoming paychecks. When Fleming failed to return to work at Extermital after receiving the money, Extermital issued the stop payment order.
 {¶ 2} On January 14, 2005, Triangle filed a Motion for Summary Judgment. On February 10, 2005, Extermital filed Defendant's Reply and Memorandum Contra to the Motion. On October 5, 2005, in Dayton Municipal Court, the matter proceeded to a bench trial without a ruling on Triangle's summary judgment motion. On January 11, 2007, the municipal court granted judgment for Triangle against Extermital in the amount of $4, 300.00 plus interest and court costs.
 {¶ 3} Extermital asserts the following assignment of error:
 {¶ 4} "APPELLEE FAILED TO MEET ITS BURDEN OF ESTABLISHING REASONABLE COMMERCIAL STANDARDS AND IT FAILED TO OBJECTIVELY ESTABLISH THAT IT ACTED IN ACCORDANCE WITH THESE STANDARDS."
 {¶ 5} According to Extermital, Triangle's conduct "fell below reasonable commercial standards, * * * it lacks holder in due course standing," and Extermital "established and holds the personal defense of fraud."
 {¶ 6} "In a suit by the holder of a note against the maker, the holder obtains a great advantage if granted the status of holder in due course." Arcanum Nat. Bank v. Hessler (1982), *Page 3 69 Ohio St.2d 549, 551, 433 N.E.2d 204. R.C. 1303.32 sets forth the elements required to receive holder in due course status as follows:
 {¶ 7} "(A) Subject to division (C) of this section and division (D) of section 1303.[32] of the Revised Code, `holder in due course' means the holder of an instrument if both of the following apply:
 {¶ 8} "(1) The instrument when issued or negotiated to the holder does not bear evidence of forgery or alteration that is so apparent, or is otherwise so irregular or incomplete as to call into question its authenticity;
 {¶ 9} "(2) The holder took the instrument under all of the following circumstances:
 {¶ 10} "(a) For value;
 {¶ 11} "(b) In good faith;
 {¶ 12} "(c) Without notice that the instrument is overdue or has been dishonored or that there is an uncured default with respect to payment of another instrument issued as part of the same series;
 {¶ 13} "(d) Without notice that the instrument contains an unauthorized signature or has been altered;
 {¶ 14} "(e) Without notice of any claim to the instrument as described in section 1303.36 of the Revised Code;
 {¶ 15} "(f) Without any notice that any party has a defense or claim in recoupment described in division (A) of section 1303.35 of the Revised Code." (Emphasis added).
 {¶ 16} "R.C. 1303.01 * * * defines `good faith' as `honesty in fact and the observance of reasonable commercial standards of fair dealing.' * * * *Page 4 
 {¶ 17} "`Honesty in fact' is defined as the absence of bad faith or dishonesty with respect to a party's conduct within a commercial transaction. (Internal citation omitted). Under that standard, absent fraudulent behavior, an otherwise innocent party was assumed to have acted in good faith. The `honesty in fact' requirement, also known as the `pure heart and empty head' doctrine, is a subjective test under which a holder had to subjectively believe he was negotiating an instrument in good faith for him to become a holder in due course. (Internal citation omitted).
 {¶ 18} "In 1994, however, the Ohio legislature amended the definition of `good faith' to include not only the subjective `honesty in fact' test, but also an objective test; `the observance of reasonable commercial standards of fair dealing.' (Internal citation omitted). A holder in due course must now satisfy both a subjective and an objective test of good faith." Buckeye Check Cashing, Inc. v. Camp, Greene App. No. 2004 CA 53, 2005-Ohio-926 (holding that Appellant check cashing company failed to act in a commercially reasonable manner when it cashed a post-dated check, since "the presentation of a postdated check should put the check cashing entity on notice that the check might not be good. * * * Some attempt at verification should be made before a check-cashing business cashes a post-dated check"); See also, Arcanum Nat. Bank, at syllabus. ("A transferee does not take an instrument in good faith and is therefore not a holder in due course when there are sufficient facts to indicate the transferee, by virtue of its unusually close relationship with the transferor, had reason to know or should have known of infirmities in the underlying transaction from which the instrument originated").
 {¶ 19} The parties herein stipulated that Triangle met all the elements of R.C. 1303.32 except the objective test of good faith. InBuckeye, we defined the objective prong of the good *Page 5 
faith analysis as follows:
 {¶ 20} "`The factfinder must therefore determine, first, whether the conduct of the holder comported with industry or `commercial' standards applicable to the transaction and second, whether those standards were reasonable standards intended to result in fair dealing. Each of those determinations must be made in the context of the specific transaction at hand. If the factfinder's conclusion on each point is `yes, `the holder will be determined to have acted in good faith even if, in the individual transaction at issue, the result appears unreasonable. Thus a holder may be accorded holder in due course [status] where it acts pursuant to those reasonable commercial standards of fair dealing — even if it is negligent — but may lose that status, even where it complies with commercial standards, if those standards are not reasonably related to achieving fair dealing.'" (Internal citation omitted).
 {¶ 21} In Buckeye, we further noted, "Check cashing is an unlicensed and unregulated business in Ohio. (Internal citation omitted). Thus, there are no concrete commercial standards by which check-cashing businesses must operate." We concluded, "in deciding to amend the good faith requirement to include an objective component of `reasonable commercial standards, `the Ohio legislature intended to place a duty on the holders of certain instruments to act in a responsible manner in order to obtain holder-in-due-course status."
 {¶ 22} During the proceedings below, Theresa Payton, head teller for Triangle, Debra Miller, a bookkeeper for Triangle, and Beverly Battagalia, an employee in the accounts receivable, payables, payroll and human resources department of Extermital, testified.
 {¶ 23} According to Payton, one of the tellers at Triangle presented Fleming's check to Payton, and Payton authorized the teller to cash the check. Payton stated, "There is no set policy *Page 6 
that we have written policy for cashing payroll checks. We deal with the same people over and over. We know them when they come in and I use my gut feeling a lot of times. It's at my discretion whether we cash checks or not. We don't have a written policy but we normally do not have any problems with our payroll checks at all. * * *"
 {¶ 24} Payton distinguished between employers' checks and personal checks, stating that she views employers' checks as "good checks. We don't have problems with employers' checks. We never have."
 {¶ 25} Payton stated that Fleming "came in every payday and cashed his check. We got to know him pretty well. His face — I would recognize him today if he came in." Payton further stated that the teller to whom Fleming presented the check "questioned me and asked me if I know the man in question and I told her yes and would it be ok to cash his check. I looked at him. I know who he was and I said yes." It was significant to Payton that the check was from Extermital: "That meant it was from where he worked and there would be no problem with it. That's why I made a decision."
 {¶ 26} On cross-examination, Payton testifed that the highest account balance in Fleming's account between 2001 and 2004 was "around $1800.00," and that he previously cashed checks in the amounts of $507.69, $364.12, $1300.00, and $1209.74. At the time the check at issue was cashed, Fleming's account balance was $5.52. Payton did not think that the amount of the $4300.00 check was out of the ordinary, and she stated that Triangle routinely cashes large payroll checks for its members.
 {¶ 27} The court asked Payton if there was "an amount of a check [that] would cause [her] to have like a cut off figure that would cause you to put say a three to five day hold on that *Page 7 
check until it cleared?" Payton responded, "Yeah in the thousands. In the thousands. * * * It depends on your Honor the kind of check. It depends on the relationship that we have with the member that if they have payroll deductions and if they have loans, if they have visas. It depends on the dollar amount that they may have in their account. It's a lot of factors."
 {¶ 28} Miller confirmed that Payton had the authority to honor the check. Regarding Triangle's check cashing policy, Miller stated," * * * There is no written policy that I have ever seen in the twenty-six years I've been there. This has kind of been a — we started out as a very small credit union years and years ago. At that point you are cashing checks for people you worked with when GM fist started the credit union. As the years have gone by they never real [sic] broke down the policy but it's been passed on from head teller to head teller as far as your standard on how you would handle a check when it came in." Miller stated that the teller who cashed Fleming's check followed Triangle's policy by getting prior authorization from Payton.
 {¶ 29} Battagalia testifed that Fleming was employed by Extermital since 1998. Fleming approached Battagalia about the loan, but she was not authorized to approve a loan over $500.00. Battagalia referred Fleming to her superior, and the superior approved the loan. Battagalia then issued the check, along with a promissory note, on the Friday before Labor Day weekend. When Battagalia returned to work on the following Tuesday, Fleming was absent, and his truck and uniforms were in the company parking lot. Battagalia stated that she received a call from Miller as follows: "she asked why we put a stop payment on the check and I explained to her that he didn't show up for work. She said something about — I asked her you guys didn't cash that did you and she said yeah. She said the girl took it upon herself to cash it without getting the proper authority to do so." *Page 8 
 {¶ 30} Miller was then recalled to the stand, and she denied telling Battagalia that the check had been cashed without proper authority.
 {¶ 31} In entering judgment for Extermital, the municipal court determined, "Plaintiff maintained a checking account for Fleming for several years and cashed his payroll checks on a regular basis without incident. The check in question was from Fleming's employer and dated the same day that it was cashed. The check did not state that it was a loan instead of a paycheck. There was nothing irregular or any facts on the face of the check that would alert Plaintiff to contact Defendant before cashing the check. Indeed, if Plaintiff had contacted Defendant on September 3, 2004 before cashing the check, Defendant presumably would have verified the validity of the check on the day it was issued and subsequently cashed by Plaintiff. The Court concludes that Plaintiff Triangle Credit Union was a holder in due course who acted in good faith when it honored the check drawn by Defendant Extermital." The municipal court further determined, "Our present case is distinguishable fromBuckeye in that there is nothing in that would alert Plaintiff Triangle Credit Union to verify anything before cashing Defendant's check."
 {¶ 32} Having thoroughly reviewed the record herein, we conclude that the municipal court correctly determined that Triangle acted in a commercially reasonable manner when it cashed Fleming's check. While there are no "concrete commercial standards" or written policies that Triangle must follow in cashing checks, Payton articulated Triangle's unwritten policy. In other words, in the context of the transaction at issue, Payton exercised her discretion and chose to honor the check based on Triangle's long-standing relationship with Fleming, based on the fact that the check was drafted by Fleming's employer, and based on the fact that *Page 9 
Triangle had never experienced a problem with an Extermital check in the past. We agree with the municipal court that there was nothing on the face of the check, as on the face of the postdated check inBuckeye, to alert Payton to any potential problem with the check. Further, had Payton contacted Extermital the day Fleming presented the check, we agree with the municipal court that Extemital likely would have explained the nature of the loan to Fleming, thereby authorizing Triangle to complete the transaction. That Triangle cashed the check despite the fact that it was for an amount larger than Fleming's regular paychecks, when Fleming had a small balance in his account, does not suggest that Triangle's check cashing policy, as articulated by Payton, is unreasonable or not intended to result in fair dealing; Triangle was not put on notice that it needed to act to protect its own interest. Since Triangle established its status as a holder in due course, Triangle is not subject to Extermital's defense that Fleming obtained the check by means of fraud, and Extermital is liable to Triangle for Triangle's payment on the check.
 {¶ 33} Based upon the foregoing, Extermital's single assignment of error is overruled, and the judgment of the trial court is affirmed.
 FAIN, J. and GRADY, J., concur. *Page 1